2015 CO 21

CONCERNING the APPLICATION FOR WATER RIGHTS OF the COLORADO WATER CONSERVATION BOARD IN THE SAN MIGUEL RIVER, a natural stream in the San Miguel water shed in Montrose County, Colorado,

Farmers Water Development Company, Opposer–Appellant

v.

Colorado WATER CONSERVATION BOARD, Applicant–Appellee

and

The Wilderness Society and Western Resource Advocates, Intervenors–Appellees

and

Bob Hurford, Division Engineer, Water Division 4, Appellee Pursuant to C.A.R. 1(e).

Supreme Court Case No. 13SA173

Supreme Court of Colorado.

April 6, 2015

Attorney for Opposer–Appellant Farmers Water Development Company: Felt, Monson & Culichia, LLC, Chris D. Cummins, Colorado Springs, Colorado

Attorneys for Applicant–Appellee Colorado Water Conservation Board: Cynthia H. Coffman, Attorney General, Susan J. Schneider, First Assistant Attorney General, Derek L. Turner, Assistant Attorney General, Denver, Colorado

Attorneys for Intervenors–Appellees Western Resource Advocates and the Wilderness Society: Robert K. Harris, Bart Miller, Boulder, Colorado

No Appearance by or on Behalf of Bob Hurford, Division Engineer, Water Division 4

JUSTICE EID delivered the Opinion of the Court.

¶ 1 The General Assembly has given the Colorado Water Conservation Board ("CWCB" or "Board") the "exclusive authority, *on behalf of the people of the state of Colorado,* to appropriate ... such waters of natural streams and lakes as the board determines may be required for minimum stream flows ... *to preserve the natural environment to a reasonable degree.*" § 37–92–102(3), C.R.S. (2014) (emphasis added). Pursuant to this authority, and after a notice and comment period as well as a hearing, the CWCB voted to appropriate an instream flow right ("ISF") on the San Miguel River and to file a water application for water rights with the water court. As required by section 37–92–102(3)(c), C.R.S. (2014), the Board made three determinations regarding the San Miguel ISF appropriation: that the natural environment would be preserved to a reasonable degree by the water to be appropriated; that there was a natural environment that could be preserved with the CWCB's water right; and that such environment could exist without material injury to water rights. Farmers Water Development Company ("Farmers") opposed the proposed San Miguel ISF during the notice and comment process, but did not attend the hearing.

¶ 2 The CWCB then filed an application for water rights for the San Miguel ISF in District Court, Water Division 4, which Farmers opposed. On cross-motions for determination of a question of law under C.R.C.P. 56(h), the water court was asked to determine whether the CWCB's decision to appropriate an ISF is quasi-legislative or quasi-judicial in nature. Farmers argued that the decision was quasi-judicial, and that therefore the procedures followed by the CWCB did not meet the dictates of procedural due process. The water court disagreed, concluding that the CWCB was acting in a quasi-legislative capacity when it decided to appropriate the San Miguel ISF because, among other things, it was not adjudicating individual rights.

¶ 3 We now affirm the water court's order, and hold that when the CWCB decides to make an ISF appropriation, it acts in a quasi-legislative capacity. In determining whether a decision is quasi-legislative or quasi-judicial in nature, the "predominant consideration" is "the nature of the decision rendered by the governmental body." *Cherry Hills Resort Dev. Co. v. City of Cherry Hills Vill.,* 757 P.2d 622, 627 (Colo.1988). In this case, we conclude that the CWCB's ISF appropriation is quasi-legislative because it is a policy decision to "preserve the natural environment" "on behalf of the people of the state of Colorado," § 37–92–102(3), as opposed to an adjudication of the rights of any specific party, as is the case with quasi-judicial determinations. Accordingly, we affirm the decision of the water court.

### I.

¶ 4 The San Miguel River runs some seventy miles in southwestern Colorado from the San Juan Mountains near Telluride to its confluence with the Dolores River. In 2008, the U.S. Bureau of Land Management and the Colorado Division of Wildlife recommended that the CWCB seek an ISF appropriation in a seventeen-mile reach of the San Miguel River. These entities recommended the appropriation to preserve habitat for three "sensitive" fish species (flannelmouth sucker, bluehead sucker, and roundtail chub) and to preserve habitat for "globally imperiled riparian communities" within the reach. The CWCB provided public notice of this recommendation nine times between March 2008 and November 2010. The CWCB also held public meetings to discuss the recom-

mendation in various San Miguel River Basin communities. Based on stakeholder requests, the CWCB postponed any decision regarding a San Miguel ISF until January 2011 to allow water users in the basin to adjudicate water rights for future needs. Farmers did not file for water rights during this postponement period.

¶ 5 The CWCB declared its intent to appropriate the San Miguel ISF at its January 2011 Board Meeting, provided email notice to the Water Division 4 instream flow subscription mailing list in February 2011, and announced such notice in its March 2011 Board Meeting agenda. The CWCB then set a hearing on the proposed appropriation in September 2011, assigned a hearing officer to manage the proceedings, and invited interested parties to submit comments, opinions, technical reports, and legal analyses. Farmers submitted a notice to contest the proposed instream flow on March 30, 2011. Farmers then filed a prehearing statement which included an alternative proposal, a technical analysis of the CWCB's contemplated appropriation, and a rebuttal statement with legal and factual arguments against the appropriation. However, Farmers did not participate in the September 2011 hearing.

¶ 6 At the close of the hearing, the CWCB voted to make the San Miguel ISF appropriation and file a water rights application with the water court. It also made the following three determinations regarding the appropriation, as required by section 37–92–102(3)(c):

> [T]hat the natural environment will be preserved to a reasonable degree by the water available for the appropriation to be made; that there is a natural environment that can be preserved to a reasonable degree with [the CWCB's] water right herein, if granted; and that such environment can

exist without material injury to water rights.

¶ 7 The CWCB filed its water court application in Water Division 4 in October 2011 and published notice in the Montrose Daily Press in November 2011. Farmers filed a statement of opposition, which it later amended to include counterclaims challenging the constitutionality of the CWCB's ISF process. Farmers did not challenge the CWCB's three determinations. The CWCB filed a C.R.C.P. 56(h) motion for determination of a question of law on whether the Board's decision to make an ISF appropriation is quasi-legislative in nature. Farmers filed a response and its own C.R.C.P. 56(h) and summary judgment motions and counterclaims, arguing that because the CWCB's ISF determination is quasi-judicial in nature, its procedures were deficient under due process standards.

¶ 8 The water court found in the CWCB's favor, concluding that "the relevant factors weigh in favor of categorizing an ISF appropriation as a quasi-legislative proceeding" because it is "not designed to determine the rights and duties of specific individuals, but [is] designed to enact a legislative policy of preserving instream flows in order to protect the environment." After the water court issued its order, Farmers stipulated to the entry of a decree, reserving the right to appeal the water court's judgement to this court.[1]

¶ 9 Taking guidance from our *Cherry Hills* decision, we focus on the nature of the CWCB's decision to make an ISF appropriation. 757 P.2d at 627. In this case, we conclude that the CWCB's decision is quasi-legislative because it is a policy decision to "preserve the natural environment" "on be-

---

1. We review the following issues on appeal:
   1. Whether the Division 4 Water Court erred in determining that the Colorado Water Conservation Board ("CWCB") administrative process for appropriation of minimum instream flow ("MISF") water rights is quasi-legislative, not quasi-judicial;
   2. Whether the Division 4 Water Court erred in determining that the CWCB administrative process for appropriation of MISF water rights does not affect the rights and duties of specific individuals, but rather is a purely prospective enactment of legislative policy;
   3. Whether the Division 4 Water Court erred in relying upon statutory requirements for an informal public "notice and comment" procedure, in determining that constitutional due process requirements were inapplicable; and,
   4. Whether the Division 4 Water Court erred in denying Farmers' claims for summary judgment based upon the above asserted errors.

half of the people of the state of Colorado," § 37–92–102(3), as opposed to an adjudication of the rights of any specific party, as is the case with quasi-judicial determinations. Accordingly, we affirm the decision of the water court.

## II.

### A.

¶ 10 Section 37–92–102(3) vests the CWCB with the exclusive authority to appropriate minimum instream flow water rights:

> [R]ecognizing the need to correlate the activities of mankind with some reasonable preservation of the natural environment, [the CWCB] is hereby vested with the exclusive authority, on behalf of the people of the State of Colorado, to appropriate in a manner consistent with sections 5 and 6 of article XVI of the state constitution, such waters of natural streams and lakes as [the CWCB] determines may be required for minimum stream flows or for natural surface water levels or volumes for natural lakes to preserve the natural environment to a reasonable degree.

Utilizing "a public notice and comment procedure," the CWCB may determine, in its discretion, "whether or not to appropriate minimum stream flows ... to preserve the natural environment to a reasonable degree." § 37–92–102(4)(a), C.R.S. (2014).

¶ 11 The CWCB's Rule 5, codified at 2 Code Colo. Regs. 408–2:5 (2014), establishes the procedures for determining whether to make an ISF appropriation. In accordance with section 37–92–102(4)(a), the Rule requires notice and comment at various stages in the determination process, including at the January Board Meeting during which the CWCB declares its intent to appropriate, at the March Board Meeting during which the CWCB takes public comment on all ISF appropriations, and during any hearings for contested ISF appropriations. Colo. Water Conservation Bd. Rule 5c, 2 Code Colo. Regs.

408–2:5 (2014). It also requires the CWCB to hold a hearing on any contested ISF appropriation,[2] during which parties can provide additional evidence, witnesses, and arguments for or against the appropriation in accordance with procedures outlined by the Rule. *Id.* at 5j–p. At the November Board Meeting, the CWCB updates the public on the hearing results and takes final action on contested instream flow appropriations. *Id.* However, "[w]hen necessary, the Board may modify or delay this schedule or any part thereof as it deems appropriate." *Id.*

¶ 12 At the end of the process, the CWCB may decide to make the appropriation and file a water rights application with the water court, decide not to file such an application, or table the proposal. *See* Colo. Water Conservation Bd. Rule 4g, Code Colo. Regs. 408–2:4 (2014). If the CWCB decides to file an application with the water court, it must make three determinations as required by section 37–92–102(3)(c):

> [T]hat the natural environment will be preserved to a reasonable degree by the water available for the appropriation to be made; that there is a natural environment that can be preserved to a reasonable degree with [the CWCB's] water rights, if granted; and that such environment can exist without material injury to water rights.

¶ 13 Once the CWCB submits a water rights application in water court to adjudicate its ISF appropriation, it provides notice to the public in the water court resume. *See* §§ 37–92–102(4)(b)(II)(A), –302(1)(a), –302(3)(a), C.R.S. (2014). Any party opposed to the application may file a statement of opposition. § 37–92–302(1)(b), C.R.S. (2014). The water court reviews the CWCB's three determinations "based on the [CWCB's] administrative record" and must apply a deferential standard of review according to the State Administrative Procedure Act ("APA"). §§ 37–92–102(4)(c), 24–4–106(7), C.R.S. (2014).[3] If the appropriation is decreed, it is

---

2. If the proposed appropriation is not contested, the CWCB need not hold a hearing, and may make its determinations at the May board meeting or any board meeting thereafter. *Id.* at 5h.

3. Section 37–92–102(4)(c) instructs that the three determinations should be reviewed under section 24–4–106(7), C.R.S. (2014), of the APA, which provides that:

> If the court finds no error, it shall affirm the agency action. If it finds that the agency ac-

administered within the priority system and is subject to present uses or exchanges in existence on the date of the appropriation. § 37–92–102(3).

### B.

¶ 14 Farmers does not dispute that the above-described procedures were followed in this case. Instead, Farmers argues that the CWCB's ISF determination is quasi-judicial in nature, and that therefore the CWCB's notice and comment period and hearing procedures do not comport with the procedural due process requirements of quasi-judicial action. The CWCB responds that its ISF determinations are quasi-legislative, and thus do not need the procedural due process protections required of quasi-judicial actions.[4] Therefore, this case requires us to consider whether the CWCB's ISF determination is quasi-legislative or quasi-judicial in nature. We review the water court's determination of this issue of law de novo. *City of Englewood v. Burlington Ditch, Reservoir & Land Co.*, 235 P.3d 1061, 1066 (Colo.2010).

¶ 15 Administrative agencies may be tasked with performing functions that are akin to those performed by legislatures and the judiciary, hence the terms "quasi-legislative" and "quasi-judicial." *Cherry Hills Resort Dev. Co.*, 757 P.2d at 625–26. In *Cherry Hills*, we set forth the analysis for distinguishing quasi-judicial actions from quasi-legislative actions. In that case, a developer requested that the Cherry Hills Village City Council approve a plan for a hotel and residential development. *Id.* at 623–24. After giving notice to the public and conducting several hearings (neither of which were required by statute), the City Council adopted a resolution approving the plan but imposing twenty restrictions on the plan. *Id.* at 624. The district court concluded that the City

Council abused its discretion in imposing twelve of the restrictions. *Id.*

¶ 16 The court of appeals reversed, holding that the district court did not have jurisdiction to review the Council's decision under C.R.C.P. 106(a)(4) because the Council was not "exercising judicial or quasi-judicial functions" as required by the Rule. The court of appeals applied the three-factor test this court set forth in *Snyder v. City of Lakewood*, 189 Colo. 421, 542 P.2d 371, 374 (1975), *overruled on other grounds by Margolis v. Dist. Court*, 638 P.2d 297 (Colo.1981), which denominated an act quasi-judicial when (1) a state or local law required notice to the community; (2) a state or local law required a public hearing at which concerned citizens are given an opportunity to be heard and present evidence; and (3) a state or local law "require[d] the body to make a determination by applying the facts of a specific case to certain criteria established by law." Concluding that the first two *Snyder* factors were not met because notice and a hearing were not required by law, the court of appeals held that the Council's decision was quasi-legislative in nature and therefore unreviewable under C.R.C.P. 106(a)(4). *Cherry Hills*, 757 P.2d at 624.

¶ 17 This court reversed the court of appeals, holding that because the resolution was not one of general applicability, but rather affected a specific developer's property interest in and use of the land in question, the Council's action was "clearly the type of governmental decision that is traditionally associated with quasi-judicial activity." *Id.* at 628. The court of appeals' rationale was flawed, we stated, because it placed undue weight on the fact that notice and a hearing were not required by law, the first two *Snyder* factors. *Id.* at 626. We opined that such reasoning would shield from review quasi-

tion is arbitrary or capricious, a denial of statutory right, contrary to constitutional right, power, privilege or immunity, in excess of statutory jurisdiction, authority, purposes, or limitations ... an abuse or clearly unwarranted exercise of discretion, based upon findings of fact that are clearly erroneous on the whole record, unsupported by substantial evidence when the record is considered as a whole, or otherwise contrary to law, then the court shall

hold unlawful and set aside the agency action[.]

4. The CWCB argues in the alternative that even if the ISF determination is quasi-judicial, the notice and comment period followed by the hearing in this case was consistent with procedural due process. Because we determine that the ISF decision is quasi-legislative, we need not reach this argument.

judicial actions simply based on whether notice and a hearing were required by law. *Id.* Instead, "*the nature of decision rendered by the governmental body,* and not the existence of a legislative scheme mandating notice and a hearing, . . . is the predominant consideration in determining whether the governmental body has exercised a quasi-judicial function in rendering its decision." *Id.* at 627 (emphasis added).

¶ 18 Focusing on the nature of the action, we stated that quasi-judicial action "involves the determination of the rights, duties, or obligations of specific individuals on the basis of the application of presently existing legal standards or policy considerations to past or present facts developed at a hearing conducted for the purpose of resolving the particular interests in question." *Id.* at 625. Quasi-legislative action, by contrast, is "usually reflective of some public policy relating to matters of a permanent or general character, [and is] not normally restricted to identifiable persons or groups, and [is] usually prospective in nature." *Id.* Applying this analysis, we concluded that the Council's decision to approve the development plan with restrictions was quasi-judicial in nature because the action "pertained only to the use of the particular site in question," rather than a decision impacting "future land use on a citywide basis," and because the Council applied a pre-existing set of criteria to determine whether to approve the plan. *Id.* at 628.

■ ¶ 19 While the quasi-judicial nature of the action in *Cherry Hills* meant that the Council's decision was subject to review under C.R.C.P. 106(a)(4), the distinction between quasi-judicial and quasi-legislative action has broader implications for procedural due process. As we noted in *Cherry Hills,* because quasi-judicial action impacts specific individuals, "the exercise of quasi-judicial authority, unlike legislative authority, is conditioned upon the observance of traditional procedural safeguards against arbitrary government action . . . [which] consist of providing adequate notice to those individuals whose protected interests are likely to be adversely affected by the governmental action, and giving to such persons a fair opportunity to be heard prior to the governmental

decision." *Id.* at 625 (citing, among other cases, *Shoenberg Farms, Inc. v. People ex rel. Swisher,* 166 Colo. 199, 444 P.2d 277, 282 (1968)). Indeed, procedural due process requires an agency to provide notice and afford a hearing to "every affected individual" when acting in a quasi-judicial capacity. *Shoenberg Farms,* 444 P.2d at 282. By contrast, "the law is clear that where an administrative agency is acting in a quasi-legislative capacity, there is no [c]onstitutional requirement that the agency provide the opportunity for a hearing to anyone," even though such a hearing may be held pursuant to other law. *Id.*

¶ 20 Farmers contends that because the CWCB's decision to appropriate the San Miguel ISF is quasi-judicial in nature, the notice and comment period followed by the hearing in this case is insufficient to meet the dictates of procedural due process. We disagree.

¶ 21 Applying the *Cherry Hills* analysis to the CWCB's ISF determination, we hold that it is quasi-legislative in nature. The CWCB's ISF determination is not an adjudication of the rights, duties, or obligations of specific individuals or entities. Rather, the ISF process concerns the rights of the people of Colorado, with a prospective policy focus on protecting the environment.

¶ 22 We begin with the fact that the legislature vested the CWCB with exclusive authority to appropriate instream flows "on behalf of the people of the state of Colorado." § 37–92–102(3). We have consistently recognized that the CWCB acts to protect the environment on behalf of the public. *See, e.g., Bd. of Cnty. Comm'rs v. United States,* 891 P.2d 952, 971–72 (Colo.1995) (recognizing that the CWCB is "the mechanism to address state appropriation of water for the good of the public"); *Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd.,* 901 P.2d 1251, 1259 (Colo.1995) (holding that the CWCB "acts on behalf of the people of the state of Colorado and is thereby burdened with a fiduciary duty arising out of its unique statutory responsibilities"); *Thornton v. Bijou Irrigation Co.,* 926 P.2d 1, 93 (Colo.1996) (recognizing that in giving the CWCB exclusive authority to appropriate minimum instream flows on behalf of the public, the

legislature prohibited the judiciary from decreeing instream flow rights to a private party). Thus, to the extent that any rights are at issue in the CWCB proceeding, it is the public's interest in the preservation of the environment.

¶ 23 Moreover, the purpose of the CWCB's ISF proceedings is to establish whether a water appropriation by the CWCB would preserve, "to a reasonable degree," the existing natural environment without injury to existing water rights. § 37–92–102(3)(c). This is a policy determination within the discretion of the CWCB. For example, in rejecting a challenge to the constitutionality of the legislative delegation of power to the CWCB, we described the nature of the CWCB process. Specifically, we stated that "[t]he legislative objective is to preserve reasonable portions of the natural environment in Colorado," and that the legislature empowered the CWCB, an agency "having specific expertise regarding the preservation of flora, fauna and other aspects of the natural environment," to pursue that policy objective through appropriation of instream flows. *Colo. River Water Conservation Dist. v. Colo. Water Conservation Bd.*, 197 Colo. 469, 594 P.2d 570, 576–77 (1979); *see also Bd. of Cnty. Comm'rs*, 891 P.2d at 971 (holding that the "policy of protecting the natural and man-made environment" is addressed through the "statutory mechanism" of the CWCB's appropriation of instream flows); *Aspen Wilderness*, 901 P.2d at 1256 (noting that the CWCB is "a unique entity charged with preserving the natural environment to a reasonable degree for the people of the State of Colorado"). Thus, the appropriation of instream flows in order to protect the natural environment is a policy determination delegated to the CWCB. Indeed, the purpose of the CWCB's notice, comment, and hearing process is to gather input from the public regarding this policy determination.

¶ 24 Furthermore, the CWCB's determination that a particular ISF will preserve the environment to a reasonable degree is a prospective policy determination. As we con-

cluded in *Aspen Wilderness*, section 37–92–102(3) bestows a unique fiduciary obligation upon the CWCB on behalf of the people of Colorado to preserve the environment on an ongoing basis. 901 P.2d at 1260. Thus, "it applies generally applicable policy going forward," which we have recognized as a hallmark of prospective policy determinations. *San Antonio, Los Pinos & Conejos River Acequia Pres. Ass'n v. Special Improvement Dist. No. 1 of Rio Grande Water Conservation Dist.*, 270 P.3d 927, 940 (Colo.2011) (finding a subdistrict plan to be "prospective in nature").

¶ 25 Finally, the fact that the CWCB must make three determinations before seeking an ISF decree from the water court—namely, that the ISF appropriation will preserve the environment to a reasonable degree; that there is such an environment to be preserved; and that appropriation, if decreed, will preserve an environment without material injury to water rights—does not imply that the appropriation process is an adjudication. Rather, the three determinations are simply the way in which the legislature chose to channel the Board's policy discretion. *See Aspen Wilderness*, 901 P.2d at 1257 (noting that the CWCB is "not at liberty to freely appropriate any body of water for any purpose or beneficial use it determines. Rather it must confine its appropriations and other actions[5] to the express statutory purpose of maintaining minimum stream flows necessary to preserve the natural environment to a reasonable degree." (footnote omitted)). By requiring these three determinations, the legislature ensured that the CWCB, subject to deferential judicial review, properly pursued its policy objectives.

¶ 26 In sum, the focus of an ISF appropriation by the CWCB is not on the rights of identifiable individuals or entities in the relevant water basin. Instead, the focus is on carrying out a policy of preserving the natural environment for the people of Colorado. We therefore agree with the water court that the ISF determination is quasi-legislative in

---

5. In 2002, the General Assembly amended section 37–92–102(3) to permit the CWCB to acquire by "contractual agreement" water rights "in such amount as the board determines is appropriate … to preserve *or improve* the natural environment to a reasonable degree." Ch. 149, sec. 1, § 37–92–102(3), 2002 Colo. Sess. Laws 445, 445 (emphasis added).

nature because it is "not designed to determine the rights and duties of specific individuals, but [is] designed to enact a legislative policy of preserving instream flows in order to protect the environment." Accordingly, we affirm the water court's decision that the CWCB's ISF process is quasi-legislative in character.

¶ 27 Farmers makes several arguments to support its contention that the CWCB's ISF determination is quasi-judicial in nature, but we find them unavailing. Farmers points to the first two *Snyder* factors, and emphasizes that notice and a hearing (when an ISF application is opposed) are required by law for CWCB proceedings. As noted above, we made clear in *Cherry Hills* that the absence of such procedural protections mandated by law is not determinative of quasi-judicial or quasi-legislative status. We apply that same reasoning here to conclude that the presence of such legally-mandated procedures is likewise not determinative. This is true even though those procedures might be strong evidence of a quasi-judicial character. *Compare Cherry Hills*, 757 P.2d at 626–27 (reasoning that mandated notice and hearing procedures may be a "clear signal" or "compelling proof" of quasi-judicial character), *with id.* at 626 (noting that "the nature of the decision rendered by the governmental body, and not the existence of a legislative scheme mandating notice and a hearing," is the "predominant consideration" in determining quasi-judicial action). At bottom, it is the nature of the decision that is the predominant consideration, and here, as we concluded above, the nature of the decision is quasi-legislative.

¶ 28 Farmers also argues that the CWCB's ISF determination must be quasi-judicial in nature because it is an administrative substitute for water court proceedings, which are adjudicative. But this argument stems from the false premise that the CWCB process is a substitute for water court proceedings. In fact, the CWCB process is not

the adjudication of a water right, as Farmers seems to suggest. The CWCB does not decree water rights. Instead, the CWCB determines *whether* it should seek an ISF decree from the water court. *See* Colo. Water Conservation Bd. Rule 4g, 2 Colo.Code Regs. 408–2:4 (2014) (characterizing the Board's "final action" as a decision to "(1) file a water right application, (2) not file a water right application or (3) table action on an ISF appropriation"). If it does decide to pursue an ISF decree from the water court, it must first make the three determinations under section 37–92–102(3)(c), which are reviewed under the standard set forth in sections 37–92–102(4)(c) and 24–4–106, C.R.S. (2014). If the water court is satisfied that there are no grounds for setting aside the CWCB's action, it is the water court, not the CWCB, that issues the ISF decree. *See* § 37–92–304(5), C.R.S. (2014). As we made clear in *Aspen Wilderness*, "[t]he water court's 'exclusive jurisdiction' [over water matters] was not altered or limited by the creation of the [CWCB];" therefore, the CWCB cannot modify an ISF decree on its own and instead must return to the water court to seek a modification of the decree. 901 P.2d at 1258–59.[6]

¶ 29 Farmers also takes issue with the deferential standard of review to be applied by the water court based on an examination of the administrative record under sections 37–92–102(4)(c) and 24–4–106. Farmers complains that it "never gets its day in court" because the CWCB's determination that an ISF appropriation will benefit the existing natural environment without materially injuring existing water rights is subject to a deferential standard of review. But this again presumes that the CWCB process is an administrative substitute for water court proceedings, which it is not. There is no "day in court" regarding a quasi-legislative policy decision of an agency. As noted above, "the law is clear that where an administrative

---

6. In 1996, the General Assembly amended § 37–92–102, C.R.S. (1996), to include subsection (4)(b)(III), which states that the Board's final written determination regarding a decrease shall "be filed promptly with the water court." Ch. 187, sec. 1, § 37–92–102(4)(b)(III), 1996 Colo. Sess. Laws 952, 953–954. The water court shall then "promptly enter an order decreasing the board's appropriation decree in accordance with the board's written determination" unless a petition for judicial review of the determination is filed, at which point the water court can affirm or set aside the determination. § 37–92–102(4)(b)(III), C.R.S. (2014).

agency is acting in a quasi-legislative capacity, there is no [c]onstitutional requirement that the agency provide the opportunity for a hearing to anyone," even though such a hearing may be held pursuant to other law. *Shoenberg Farms,* 444 P.2d at 282. To the extent the CWCB statute gives Farmers a "day in court," Farmers had the opportunity to participate in the notice and comment process as well as the CWCB hearing (although it did not attend). In addition, Farmers had the opportunity to oppose the San Miguel ISF before the water court, which led to this appeal.

¶ 30 Finally, Farmers argues that the CWCB's ISF determination impermissibly affects the right of holders of vested water rights in the San Miguel River. This argument is without merit. First, it appears to be an attempt to challenge one of the CWCB's three determinations—namely, that the San Miguel ISF appropriation, if decreed, will preserve an environment without material injury to water rights. But because Farmers did not challenge this determination in water court, it cannot do so now on appeal. *See, e.g., Pub. Serv. Co. of Colo. v. Willows Water Dist.,* 856 P.2d 829, 831 (Colo.1993) (declining to address an issue not raised in water court). Second, "[b]ecause instream flows are administered within the priority system, the instream flow cannot take water away from existing uses and the senior [water rights holder] will always be able to make its diversion for its decreed beneficial uses." *See Colo. Water Conservation Bd. v. City of Central,* 125 P.3d 424, 438–39 (Colo.2005). And though instream flows may affect development in the form of changes, augmentation plans, and future appropriative rights, "all water rights complicate the efforts of new or existing users to develop sources of supply," *id.* at 440, and those water rights, like the CWCB's appropriations, are properly adjudicated by the water court. Third, the CWCB delayed its administrative process to allow water users in the basin to adjudicate water rights for future needs, and Farmers chose not to file for water rights during the postponement period. In short, because instream flows are junior water rights which cannot place a call on senior water rights, we find Farmers' argument regarding injury to other water rights unconvincing.

¶ 31 At bottom, the focus of the CWCB's instream flow appropriation is not on the rights of identifiable individuals or entities, but instead on the furtherance of a policy of preserving the natural environment for the people of Colorado. We conclude it is quasi-legislative in nature, and therefore affirm the water court's decision.

### III.

¶ 32 For the reasons stated above, we affirm the decision of the water court.